against Meza-Rodriguez. May it please the court, my name is Joe Bugney from the Federal Defender's Office. There are two issues that this court must decide. First, whether or not the people using the Second Amendment has the same breadth and understanding as it's used in the First Amendment and the Fourth Amendment. And second, what level of scrutiny the district court should apply upon remand if this court decides whether or not to remand this person. We might have one more issue. Is Meza-Rodriguez still in the United States? No, he's not, Your Honor. Well, then I think we need to wrestle with Diaz against Duckworth, which holds that a challenge to a criminal conviction of someone who has been removed is moot. Your Honor, I'd ask if I could brief that with a real point of view. Because he's no longer serving the sentence, no longer subject to supervision in the United States. That was the rationale of Diaz. So we've got a problem under Article III here, at least if Diaz is correct. Thank you, Your Honor. I would just point out two things. One, this is still direct appeal. I don't know if I have the right understanding of Diaz, but I believe that was a post-conviction appeal. And in which case, yeah, Mr. Diaz would not be subject to any kind of confinement. A habeas would not attach. But here, this is a direct appeal of his criminal conviction. And it also has great implications upon his immigration rights. His ability to reapply, to come here legally. I think that's something you might want to say if you file a supplemental memo. But I think the same could have been said in Diaz. Maybe we need to reconsider Diaz in light of the collateral consequences of a federal conviction. Because I assume that the conviction would greatly defer, if not eliminate, the possibility of lawful re-entry. Completely eliminates, Your Honor. Right, this would surely completely eliminate. Well, for the third case for this morning, I would be glad to give you the opportunity to file supplemental statements on the effect of Diaz against Duckworth within 14 days, simultaneous filing. Just to help you out, citation is 143, fed third, 345. Seventh Circuit, 1998. And you may want to note that Diaz has not won universal favor in other circuits. Pardon about for the brief, I don't know. Thank you. All right, so there you are. So Diaz, to the contrary, notwithstanding, it seems to me, even if one were to agree with you that when the Second Amendment uses the words, the people, it's sensible to think that they mean the same thing as in other amendments. And even if we were to say some intermediate level of scrutiny, whatever that means, something along the lines of what we did in Skoyan is appropriate, it strikes me that Congress does have extensive power over the immigration function. Congress has huge power at the border. And people who are undocumented are difficult to identify and track. There is certainly, even in the post-Heller world, an important interest of the government in keeping records about firearms, making, find out who buys them and whether people have licenses. So it's not a total free-for-all. So maybe you can focus your remarks with those thoughts in mind. Sure, two points. First, Congress's power over immigration doesn't mean they can strip the rights of undocumented or actually documented aliens for the Fourth Amendment, for the First Amendment, or other parts of it. When they're doing an immigration-related thing, saying if you are here in an undocumented way, you are less likely to be visible in society. You are maybe not going to have a driver's license or you're not going to have a social security number. Again, I'm talking about a law-abiding, undocumented immigrant whose only goal in life is not to come to the government's notice. And there are, I'm sure, such people. So Congress might say, if somebody like that owns a gun, this is a different kind of problem than the problem of someone who is either in lawful status or somebody who is a U.S. citizen. Sure, and does Congress's recognition of that being a problem trump that person's right to be secure in his house? Yeah, I mean, why not? Say, we didn't invite you anyway, and if you are here in an undocumented capacity, one of the things is you can't anonymously possess a firearm. Well, why not? Why not? Because that person still has a right to actually protect himself. And that right would trump the Congress's interest to say, I want to have documentation. I want to know exactly. That begs the question. It does beg the question entirely. Well, it begs the question of, what exactly is Congress's intention in this? No, it doesn't beg the question about Congress's intention. You said the reason why they can't be prevented from having a gun is because they have a right to have a gun to protect themselves. That's what begs the question. Whether they have such a right is the question. And that would be part of what I assumed in the question itself. But I believe they do have that right. So whether they have the right, I mean, we have said, for example, in Scoyon, we said, yes, we understand Heller recognizes that this is a personal right. But if you've committed a misdemeanor crime of domestic violence, you forfeit that right. And we upheld the statute, even though Heller itself was talking about felonies, fine. And the court itself in Heller said, this is a personal right. But to say it's a personal right doesn't mean that it sweeps the field. There are other governmental interests that it's going to run up against from time to time. One can imagine property rights. One could imagine misdemeanors, whatever they are. We're slowly seeing them unfold in the courts. Now we have the personal right of an undocumented immigrant up against Congress's interest in keeping people accountable who have guns. You're not arguing that it's unlawful for there to be registries, I assume. No, not at all. But how do you keep a registry if somebody's undocumented? Well, I mean, the registries are part and parcel of, one, do you have to register every firearm? No, you can buy them in private sales. There's no need that an undocumented alien have- But you don't think it's the case that Congress couldn't pass such a law. It hasn't chosen to do so. Do you think it would be unconstitutional for Congress to pass a law requiring registration of all firearms, including private sales? No, the Second Amendment would not say that you couldn't do that. Right, and so why isn't Congress entitled on a one-problem-at-a-time basis to say, gee, we have a set of people, maybe very law-abiding people. I'm certainly willing to assume that myself. But they're hard to track because they don't want to be tracked. They're undocumented. You don't want them to own guns. That's the court supplying the government's actual own response. I mean, the government didn't have that. That wasn't part of the congressional findings. That's just the court postulating at what could have been the response or what could have been the reason behind this. When Congress passed the bill in 1968, what was really going on? What's the reason that we have here? And what is that compelling interest? How do we balance that? Do we balance that against Mr. Mesa's right to be secure in his house? Do we say, well, we really care about where these firearms are. We really don't want people who are undocumented having it. Well, what's the government interest in that? Is that reasonable? Yeah, it's reasonable. There'd be a rational basis for that law. But whether or not it would survive a heightened scrutiny, whether it's a, is this really compelling? Remember, it's the government's burden when it comes to convicting somebody and putting them in prison for exercising a constitutional right. So what is Mr. Mesa's right to be in his house, securely or otherwise, since he doesn't have proper documentation to be in the United States at all? Well, he has an absolute right. I mean, you can't just run into his house and grab him. He'd have a Fourth Amendment right that you- Oh, he would have a Fourth, I agree with that. I was thinking more his right to own property in the United States, for example, or to lease. I can say that I- A landlord who said, oh, I've just discovered that you are undocumented, terminate a lease on that basis. In which case, I mean, there might be equal protection arguments to be made in that regard. I mean, I know that's come up before, where you can't discriminate against illegal, sorry, undocumented aliens because they're here just on the basis of that's being done. You can't also have an employer who says, you know what, I'm gonna retaliate against you by calling INS or threaten to do so. It runs into different problems, but at the core, it's what is this right that we're protecting? If it's Mesa's right to actually protect himself and to have a firearm, then it has to be a compelling reason that we're going to infringe upon that. And he has that right, just as he has the Fourth Amendment right. Just as you can't run into his house and arrest him without probable cause or without a warrant, so too you can't strip him of that right to protect himself with a firearm. Counsel, I've got a question about why you want us to look at the people only in the Bill of Rights and not at the rest of the Constitution. It not only begins we the people, obviously referring to people entitled to vote, but Article II, Section 1, Clause 1 says that, quote, the people, close quote, elect members of the House of Representatives. You think that means aliens are entitled to vote for members of the House? No, but I believe that- All right, so we've got some uses in the Constitution that plainly exclude aliens. The context plainly excludes aliens. Why are you confident that we should ignore the people in Article II, Section 1 and look only at the Fourth Amendment? Well, one, because those were codified at the same time. They're all passed in 1791. They're all passed by the same people. Well, the Bill of Rights, though, is- James Madison writes them all. You don't want to go too far down that road. They really are the same people. I mean, it not only begins the people also appears in the Ninth Amendment. It appears in the Tenth Amendment. But when it comes to the secured rights of the Bill of Rights, and what- Look, I'm asking why you think we ought to be disregarding the whole context of the contemporaneous part of the Constitution. Akhil Amar would refer to this as intratextualism. At least you look at all the uses of the people that are contemporaneous. And given the intratextualist argument that what we'd have right then is it would fall apart because if the right is actually pre-existing, if this is something that is secured, it's not given over. The right of the people to vote, well, women wouldn't be covered by that. If it came to the, you know, when- That's why there was a need for the 18th Amendment. True. And also people under 18-year-olds, why we have the 26th Amendment. Yes. But we couldn't say that- You're digging yourself a hole. No, but the point is that if it's a pre-existing right, it's not dependent upon an act of Congress to ratify that, to change that. If it's something that would say, common law, you have this, that this is a natural law right that you have, then it's not dependent upon Congress's action. Natural law, oh dear. That's exactly what Heller said. What else is pre-existing if it's not natural law? I mean, look, defense attorneys don't often cite to that, but- No, look, you're, as I say, you're digging. When you start saying that the people is part of, meaning of the people is part of natural law, you're saying, for good or ill, that people not entitled to be in the United States at all are entitled to vote for members of the House. I have a better response. That Heller, when Heller uses it, Heller's the one that looks to it. Heller looks, and so does Verdugo or Quez. Both look at second, fourth, first. Now, they don't look, when they're interpreting Heller, they don't go to section two or article two, section- Preamble, we the people. They don't go to those two when defining who is covered by the second amendment. And they also don't go to that in the fourth amendment with Verdugo or Quez. And they don't go to that when it comes to the first amendment. That's why you would interpret it the same. If you're gonna follow the Supreme Court, then you should look to what the Supreme Court did in Heller and find those exact same three instances to define who it reaches the people to. And that's the same as the first and the fourth. Are there any other questions? All right, thank you. Ms. Hoffman. Thank you, may it please the court, counsel. My name is Gail Hoffman. I represent the United States of America. And first off, I would like to apologize for not addressing Diaz in my brief. I totally missed it. So I can't say anything that would be intelligent on that case. And I would be happy to submit something in 14 days. But I'm hoping, I trust we're all hoping that in those memos, you'll discuss what other circuits have had to say about that problem. Justice Sotomayor had something to say about that when she was on the second circuit and it's not consistent with Diaz, for example. And maybe we can figure out what to do here. That would be great. All right, so we will look forward to your memos. So with that, Judge, Your Honor, I think that in some respects, discretion is the better part of valor. And I'm open to addressing any questions that the court has. Well, I have a question. I mean, I think Mr. Bugney makes a strong argument when he says, you know, we're in a new world now. And the Second Amendment has the status as a personal right, just as the Fourth Amendment does, just as the First Amendment does. Once you're a person, and you could look at an undocumented person and unless he or she was wearing a sandwich sign, that would probably just kind of look like a person to you. And why don't they have the right to secure themselves? And, you know, I assume they have a right not to have unwanted medical treatments. They have a right, a whole set of personal rights. So why are we carving this out? And what's your best argument for constitutional or other texts that would allow the government to meet an intermediate scrutiny burden? Well, first of all, the Second Amendment is an affirmative right to keep and bear arms. Well, actually, already, Mr. Bugney disagrees with you. He, following the court's language, says, no, it acknowledges that from time immemorial, people have had that right, and it secures it. It kind of reaffirms it, so to speak. Well, Mr. Bugney and I have often disagreed, and I certainly accept our disagreement at this point here, too. But I would posit that the Second Amendment is an affirmative right, and the Fourth and the First are protective rights. And the Fifth Circuit case, Puerto Munoz, accepted that argument. And in fact, when a petition for cert was presented to the Supreme Court, they denied to take the case. That doesn't mean anything, though. They get 9,000 or so petitions a year, and this year, they're coming up on, what, 60 cases? It's a low number of cases this year, and they tell us repeatedly not to read anything into that. But I would also say- I mean, the Fifth Circuit was all about accepting social obligations and things like that, and I don't know what that means, for one thing. A huge number of undocumented people work very hard and contribute to our economy, and they pay sales taxes, and they're law-abiding. And so, why do they suddenly not have Second Amendment rights? Well, we're not talking about aliens, per se. We're talking about people who are here illegally. We're talking about- Undocumented. Illegally, someone who falls under the- But it's not a crime to be here illegally. It's a crime to come back again if you've been removed. Well, it is a misdemeanor to be here illegally under Title VIII United States Code, Section 1305, Sub A. So, it's the felony if they come back after they've been deported. So, by virtue of their presence here, they're here illegally. There are past- Here's Mr. Mazur-Rodriguez. He was four years old. Do you think he was able to form the intent to violate U.S. law when he was four-year-old? No, I absolutely don't think he had, but it's in the record that his brother reminded him on several occasions that he needed to get his citizenship in order, and he chose not to and never did. Then he found himself in the situation where he was arrested, and he was an illegal alien in possession of ammunition. And I would note that before this prosecution was brought, that those in the particular area where he lived knew he was there and knew he was there illegally, and it wasn't as if that the city was trying to sweep every illegal alien out, but there came a point in time, and his arrest was it, based on the facts culminating in his arrest. He has this one little piece of, one bullet, basically. It's pretty pathetic, actually. Well, I don't really, I would respectfully disagree, and I don't think that it is- That's what he had, though, right? Right, he did- You didn't catch him with some arsenal of Uzis or something, you AK-47s. He has, what, an expended cartridge? He has a live round. He has a .22 caliber live round, but I think looking at the facts surrounding it, he's videotaped in a bar, flashing something and pointing it at people in the bar that appears to be a gun. He denies it and says it's a BB gun. The police are called. They look at the video. They're looking for him. Then they're flagged down because of an altercation. They see the person- And I'm not in any way saying that either he was behaving well or that a prosecution for being obnoxious in a bar, if there is such an offense in Wisconsin, might not have been fine, but you're talking about removing him when all he's doing is he's holding one, you're saying, unexpended bullet. Yes, I am. That's exactly what I'm saying. He's here illegally. He possessed that ammunition. Well, that's the law, but the question that you're being asked to consider is whether that particular subsection, subpart five of 922G, survives Heller. That's really in the essence what you've got. And Judge, I do believe that it does. Heller talks about law-abiding citizens. He is neither a citizen nor is he law-abiding. And I think the pre-sentence report pretty well details how he's not law-abiding. He doesn't pay taxes. He doesn't work. He's in arrears for his child support. He has a whole series of misdemeanor convictions. He had a restraining order placed against him, which prohibited him actually from possessing a firearm. We need to focus on the undocumented alien part because the government's not prosecuting him for having too many misdemeanors or for having all these other things because he might not have the right kind of misdemeanor. And so we need to see whether this kind of reason for forbidding firearm possession is consistent with Heller. So a question arises whether when Heller says law-abiding citizens, whether that was just used in the sense of a synonym for people or individuals or whatever other words you might want, where they really meant people who can go get a US passport. My interpretation of it, and granted, I'm the government and you're the court and there's a difference here, is that they would not have inserted the words law-abiding if they didn't mean law-abiding. And specifically, they said citizens. Citizens has a specific definition and that would be members or people who belong to a particular country. You're treating Heller as if it were a statute. And we have said, I think, quite frequently that it's not a statute. The opinion is an explanation of a holding and it's got lots of reservations in it. Don't seem to me that there's anything you can do with Heller that finally decides this issue. One has to address it. Now, maybe the fact that somebody is not, demonstrated to be not law-abiding is sufficient to preclude gun ownership. But I don't think you can parse a phrase in Heller and get that out. Heller, I agree. Heller says a lot of things. And from Heller, you can't, it's not a roadmap to everything. I mean, I view it as a springboard and that's how I've interpreted it in my brief and in my analysis of it. I think that the other courts, putting what I think aside, the other circuits that have looked at it have looked at Heller and they've looked at aliens in possession of firearms under 922 sub G sub five and the fifth, the fourth, the eighth and the 10th circuit have all come down on the side that prohibiting illegal aliens, not aliens, but. The fifth circuit did that, but the fifth circuit said that aliens, legal or not, are not the people to whom the second amendment applies. Now, and you seem to be defending that proposition. I'm defending. As the chief judge said, that's a little hard. The Supreme Court has certainly assumed that aliens are part of the people for purposes of the first and fourth amendments. Even for Dugore Quides, on which you're relying, said that aliens sometimes could be part of the people for the first amendment. So what would categorically make them not the people for the second amendment? It's not, it doesn't have a context like the voting context that I referred to. The context of the second amendment doesn't seem like a categorical exclusion. So why are you defending the fifth circuit? I'm saying that the fifth circuit also found that illegal aliens are not entitled to possess firearms. I'm not saying that aliens are not entitled to possess. So you're not defending the fifth circuit? No, I'm. I understood you're briefed to defend the whole thing. I'm defending the fifth circuit to the extent that it accepts the constitutionality of 922 G5. That doesn't mean in any opinion you have to accept it hook, line, and sinker. But I accept that they found that the prohibition against an illegal alien, which to me is a major distinction from possessing a firearm is valid because an illegal alien does have a path to possess a firearm. They have to get their citizenship in order. So it's not a permanent ban. Well, actually more accurately, if I'm understanding your argument, they have to get the regularity of their presence in the United States in order. Yes. I'm just going back to look at your brief. You are unconditionally making the argument that aliens are not part of the people for purposes of the second amendment. Got a section of your brief devoted to that. Are you abandoning it? No, I'm not abandoning it. I'm just modifying it for purposes of what we're discussing. I'm not abandoning my brief, but I think that given the court's questions, I think more specifically, there's no justification for finding that illegal aliens are part of the second amendment. I would, I don't. So that's one route one could take, but another route one could take is to say, we have to accept the importance of the personal right to carry firearms, but we also have to recognize that it's not completely unqualified. The Supreme Court has made that much clear through all of those reservations in Heller. And there may be ways that the government could meet the burden to show that this is a situation in which Congress is entitled to limit that right, just as it can limit the right for mentally ill people and it can limit the right for the other people that it's listed. So that's, I think, a more promising line than just saying they're not the people. Thank you, Judge. Anyway, well, I think everybody has run out of time, so we will take the case under advisement. You did use up your time, so thank you. And we will expect the supplemental filings in 14 days.